506 S.E.2d 1

**Della C. McELVEEN, Respondent/Appellant,**

v.

**Leland J. McELVEEN, Appellant/Respondent.**

**No. 2883.**

Court of Appeals of South Carolina.

Heard June 2, 1998.

Decided Sept. 14, 1998.

J. Mark Taylor, of Kirkland, Wilson, Moore, Allen, Taylor & O'Day, West Columbia, for appellant/respondent.

C. Dixon Lee, III, and James T. McLaren, of McLaren & Lee, Columbia, for respondent/appellant.

HEARN, Judge:

This is a cross-appeal from a divorce decree which, *inter alia,* awarded Della C. McElveen (Wife) alimony, child support, and attorney fees, and equitably divided the parties' marital property. We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

The parties were married in July 1979. It was Wife's first marriage and the second marriage for Leland Joseph McElveen (Husband). They have one child, a son, who was ten years old at the time of trial.

Husband earned a medical degree shortly before the parties married and has practiced medical oncology and hematology since July 1984. Husband now owns a 1/13 interest in South Carolina Oncology Associates, P.A., a professional corporation which operates a large scale medical practice providing care for cancer patients. His gross income is $41,666.67 per month or $500,000 annually. At the time of the divorce, he was forty-five years old.

When the parties met, Wife was a registered nurse employed at a hospital. After the marriage, she continued to work as a registered nurse, on at least a part-time basis, until the birth of the parties' child. She testified she and Husband earned substantially the same income throughout the first five years of the marriage while Husband completed his residency,

internship, and a fellowship in oncology and hematology. However, she has not been employed since the parties' child was born and her nursing credentials are not current. She was forty-one years old at the time of the divorce and suffers from fybromyalgia, a degenerative condition which causes her to experience recurrent headaches, fatigue, and muscle pain.

Husband left the marital home on January 21, 1994. Wife instituted this litigation in November of 1994, seeking, *inter alia,* a divorce on the ground of adultery, *pendente lite* and permanent spousal and child support, equitable division of marital property, and attorney fees and costs. Husband answered and counterclaimed, admitting he had committed adultery with Bonnie Everett after the parties separated. By amended answer and counterclaim, Husband alleged Wife had committed adultery with Bonnie Everett's husband, Stephen Everett.

The family court issued a temporary order dated February 1, 1995, requiring Husband to pay Wife $8,850 per month in temporary spousal support and $2,500 per month in temporary child support. The court further ordered Husband to pay Wife a $20,000 advance on her equitable distribution award to be used for litigation fees and costs.

The trial of this case was held on June 5 through June 9, 1995. During trial, the parties stipulated the fair market value of Husband's interest in his medical practice was $250,-000, specifically noting the stipulation was reached "independent of the experts' testimony and/or opinions, which are in substantial conflict."

By final decree of divorce dated October 6, 1995, the family court granted Wife a divorce on the ground of adultery. The court determined the marital property, including the parties' home and Husband's interest in his medical practice, should be divided on a substantially equal basis. In valuing the marital estate, the court utilized the stipulated value of Husband's interest in his practice and awarded that interest to Husband. The court awarded Wife, among other things, the marital home and $50,000 to complete renovations to the home. Further, the court ordered Husband to pay Wife $11,000 per month in alimony, $1,750 per month in child support, and $65,000 in additional attorney fees and costs.

The court also ordered Husband to secure his alimony and child support obligations by maintaining existing life insurance policies, designating Wife as sole beneficiary of seventy-five percent of the death benefits, and designating Wife as sole beneficiary of twenty-five percent of the death benefits in her capacity as trustee for the parties' child. Husband's motion to reconsider, alter or amend was, in relevant part, denied.

Subsequent to the trial but prior to entry of the October 6, 1995, final divorce decree, Wife moved to set aside the trial stipulation as to the value of Husband's interest in his medical practice, to re-open evidence, and for sanctions. In support of this motion, Wife argued she had learned of previously undisclosed negotiations to sell the medical practice. By order dated December 15, 1995, the family court granted Wife leave to undertake discovery relative to the post-trial motion and reserved the medical practice valuation and stipulation issues pending completion of the authorized discovery. Husband's motion for relief from this order was denied. Following completion of discovery, by order dated August 13, 1996, the family court found that negotiations to sell Husband's medical practice did indeed begin prior to the time of the stipulation, and that they were relevant and should have been disclosed during the original discovery process. On this basis, the court set aside the parties' stipulation and re-opened the case for the limited purpose of taking evidence on the fair market value of the practice and redividing the parties' marital property.

The hearing to redetermine the value of Husband's interest in his medical practice was held on October 11 and 18, 1996. During this hearing, Wife presented evidence establishing that negotiations to sell Husband's practice to a third party began in or about April of 1995, and ultimately resulted in a "Letter of Intent," dated October 2, 1995, signed and agreed to by all of the shareholder-physicians and the prospective purchaser, to sell the practice for a total of $23,635,000. The members of the practice subsequently withdrew from the Letter of Intent. Husband maintained at the post-trial hearing that the value of his interest in the medical practice was $183,000, as evidenced by a 1987 stock purchase agreement among the shareholder-physicians.

By order dated November 20, 1996, the family court determined that although negotiations to sell the medical practice had transpired, the 1987 stock purchase agreement among the shareholder-physicians was controlling as to the value of Husband's interest in the practice. However, the court determined "the value stipulated to by the parties during trial is the correct value to be used in the division of marital property, and I therefore find that the interest of [Husband] has a value of $250,000." Pursuant to the same order, the court awarded Wife $12,000 in attorney fees and costs incurred as a result of Husband's failure to disclose the negotiations for the purchase of the practice during initial discovery.

## *STANDARD OF REVIEW*

■ In appeals from the family court, this court has the authority to find the facts in accordance with its own view of the preponderance of the evidence. *Owens v. Owens,* 320 S.C. 543, 466 S.E.2d 373 (Ct.App.1996). This broad scope of review does not, however, require this court to disregard the findings of the family court. *Stevenson v. Stevenson,* 276 S.C. 475, 279 S.E.2d 616 (1981). Neither are we required to ignore the fact that the trial judge, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Cherry v. Thomasson,* 276 S.C. 524, 280 S.E.2d 541 (1981).

## *DISCUSSION*

### I. Valuation of Husband's Medical Practice

■ Both Husband and Wife appeal the family court's ultimate valuation of the husband's interest in his medical practice. Wife asserts the court erred in failing to find that the Letter of Intent, rather than the 1987 stock purchase agreement, was controlling as to the value of Husband's interest. Husband, on the other hand, contends the court erred in valuing his interest in an amount exceeding the $183,000 stock purchase price established by the 1987 agreement.

Until 1994, Husband practiced medicine as part of a nine-physician group known as Columbia Oncology Associates,

P.A., and a related entity known as IntraCare of Columbia, Inc. This practice was governed by a 1987 stock purchase agreement which restricted the transfer of shares in the practice and contained a method for computing the sale price. On December 31, 1994, during the pendency of this action, a tenth doctor, Dr. Truesdale, was added as an additional shareholder-physician of the practice, purchasing her interest for $183,000. On January 1, 1995, the ten shareholder-physicians of Husband's practice merged with the three shareholder-physicians of Consultants In Oncology, to form the thirteen-member South Carolina Oncology Associates, P.A. Also on January 1, 1995, after the commencement of trial in this action, the shareholder-physicians entered into another stock purchase agreement.

At the October 1996 hearing, Wife's expert, Raymond E. McKay, Jr., testified the value of Husband's interest in the practice was equal to an adjusted 1/13th of the total sum offered to the shareholder-physicians by American Oncologist Resources, Inc. pursuant to the October 1995 Letter of Intent. Considering the $23,635,000 offer, and adjusting the amount for applicable loss of benefits and salaries, Wife's expert opined the total value of the offer to the shareholder-physicians was $19,800,652 with a present value of $17,500,592. By dividing the $17,500,592 figure by thirteen, the expert concluded the per-physician value of the practice was $1,526,127 with a present value of $1,346,199. Further, the expert testified that the $1,346,199 figure represents the net economic benefit to each doctor excluding the future earnings component of the offer. However, Wife's expert admitted on cross-examination that a tangible assets approach resulted in a $183,000 valuation for Husband's individual interest in the practice.

Dr. Robert Smith, a member of Husband's practice, testified the October 1995 Letter of Intent was nonbinding because the members of the practice could choose to reject or accept the offer within a thirty-day period. Dr. Smith further testified the offer from AOR included cash, stocks, and unsecured notes. The offer also required the shareholder-physicians to agree to practice with AOR as their managing agent for a minimum of five years, pay AOR seven percent of collections per year plus $286,898 per month in management fees, and repay AOR for "up front" money, stocks, and notes during the

first five years of the contract. To pay AOR the amounts due under the agreement, the physicians would realize a twenty percent reduction in salary. Moreover, the offer included a noncompetition clause which would affect any shareholder-physician leaving the practice during the first five years. In addition, Dr. Smith stated that as to individual interests in the practice, the 1987 stock purchase agreement was in full force and effect through the end of 1994. According to Dr. Smith, the formulation set forth in the stock purchase agreement was representative of the fair market value of the practice and was utilized on December 31, 1994, when Dr. Truesdale bought into the practice for $183,000.

Husband's experts, Dr. Oliver Wood, Jr., Woodrow W. Nunnery, and Richard Cox, CPA, testified that if Husband had sold his individual interest in his practice in November 1994, the time of filing, he would have been subject to the terms and conditions of the 1987 stock purchase agreement and would have realized the amount the agreement specified. Moreover, Dr. Wood opined the stock purchase agreement "did not appear to be a device to transfer stock at below fair market value"; rather, the stock purchase agreement was entered into by unrelated parties with no contemplation of divorce and was reflective of the parties' view of the value of the practice. According to Dr. Wood, the agreement was executed for a bona fide business purpose and the methodology set forth therein was reconfirmed "by an arms-length transaction with Dr. Truesdale."

We do not believe Husband's interest in his medical practice should be valued in accordance with AOR's offer to purchase. Initially, we note the Letter of Intent was not binding, and the offer was not accepted. Secondly, the AOR offer was for the entire practice; there is no evidence indicating Husband unilaterally could have sold his individual interest in the practice for more than the amount allowable under the stock purchase agreement. In fact, experts for Husband and Wife agreed that AOR would have no interest in purchasing Husband's individual interest in the medical practice. Moreover, the AOR offer includes a covenant not to compete, compensation for which is nonmarital in nature. *Ellerbe v. Ellerbe,* 323 S.C. 283, 473 S.E.2d 881 (Ct.App.1996). In short, the unaccepted

AOR offer is of little probative value under the facts of this case.

We find the most probative evidence of the value of Husband's interest in the medical practice is the 1987 stock purchase agreement. Marital property is to be valued as of the date the marital litigation is filed or commenced. *See* S.C.Code Ann. § 20–7–473 (Supp.1997); *Jamar v. Jamar*, 308 S.C. 265, 417 S.E.2d 615 (Ct.App.1992). Here, Husband was bound by the terms of the 1987 stock purchase agreement at the time this litigation was commenced in November of 1994. Moreover, under its terms, Husband would have realized approximately $183,000 in economic benefit had he elected or been forced to sell his individual interest in the medical practice in November of 1994. This fact is bolstered by Dr. Truesdale's December 1994 buy-in at $183,000. We do not intend by our holding to suggest that a stock purchase agreement, where applicable, will always provide the best evidence of fair market value. Our holding as to the determinative nature of the stock purchase agreement in this case should be viewed as limited to the facts presently before us.

■ Finally, we note the record does not support the family court's finding that Husband's interest should be valued at $250,000. Our review of the record reveals no expert testimony from either party establishing the value of Husband's interest at $250,000 after the court set aside the parties' stipulation to that effect. The trial judge found the 1987 stock purchase agreement controlling on the issue of valuation of Husband's interest, but inexplicably determined the prior stipulated value was correct. This ruling was without evidentiary support. Once the trial judge set aside the stipulation, it was error for him to return to the value proposed in the stipulation without some evidence to support that figure. Accordingly, we reverse and hold the value of Husband's interest in the medical practice is, for purposes of equitable distribution, $183,000.

## II. Alimony

### A. Wife's Adultery

■ Over one year after Husband left the marital home, but within weeks after the trial court issued a temporary

order setting Husband's *pendente lite* alimony obligation at $8,850 per month, Husband amended his answer to allege Wife had committed adultery with Stephen Everett, the spouse of Husband's paramour Bonnie Everett. Husband argues the court erred in failing to find that Wife committed adultery and is therefore barred from receiving alimony. We disagree.

Under S.C.Code Ann. § 20–3–130(A) (Supp.1997), no alimony may be awarded a spouse who commits adultery before the earlier of these two events: (1) the formal signing of a written property or marital settlement agreement or (2) entry of a permanent order of separate maintenance and support or of a permanent order approving a property or marital settlement agreement between the parties.

To obtain a divorce based upon adultery, the evidence must be "clear and positive." *Nemeth v. Nemeth,* 325 S.C. 480, 484, 481 S.E.2d 181, 183 (Ct.App.1997). The infidelity must be established by a clear preponderance of the evidence. *Id.* The proof must be "sufficiently definite to identify the time and place of the offense, and the circumstances under which it was committed." *Id.* Because adultery is an activity that usually takes place in private, proof of adultery may be circumstantial. *McLaurin v. McLaurin,* 294 S.C. 132, 133, 363 S.E.2d 110, 111 (Ct.App.1987). Circumstantial evidence showing opportunity and inclination to commit adultery is sufficient to establish a *prima facie* case. *Panhorst v. Panhorst,* 301 S.C. 100, 102, 390 S.E.2d 376, 377 (Ct.App.1990).

Whether Wife committed adultery with Stephen Everett is a close question. The evidence presented on this issue was entirely circumstantial; however, it established that Wife and Mr. Everett developed a close personal relationship. While Husband claims the circumstances connected with their relationship suggests sexual intimacy, Wife contends that she and Everett were simply two spurned spouses commiserating with one another.

Wife began communicating by phone with Mr. Everett in the summer of 1994 and continued to do so up until the time of trial. More than 600 calls were made between the two from August 1994 through April 14, 1995. The phone calls occurred

almost daily, and many of the conversations were lengthy.[1]
Many of the calls occurred between 11:00 p.m. and 2:00 a.m.,
and many also occurred early in the morning when Wife and
Mr. Everett called one another to make sure the other had
risen.

Wife spent three weekends out of town in 1995: January 7
(Fripp Island), January 20 (Fripp Island), and February 17
(Harbor Island). Despite the fact that there were 172 phone
calls between Wife and Mr. Everett during the month of
January and eighty-two calls during the month of February,
no telephone conversations between the two took place during
these three weekends once Wife arrived at the resorts. On
both occasions when registering as a guest at Fripp Island,
Wife used her father's credit card and her maiden name. The
registrations list two adults. When Husband made allegations
of adultery against Wife, she drove back to Fripp Island,
demanding that its employees delete her files and any record
of her stay. Wife also called back on a later date to inquire
whether the files had been deleted. Although the files were
not deleted, they were altered so that an alias, rather than
Wife's name, appeared on the records. Wife denied that
anyone accompanied her to Fripp Island and testified she
went alone to work on her "client novel." She explained she
used her father's credit card because her own credit cards
were at their maximum credit limit.

Prior to driving to Harbor Island, Wife drove evasively in a
rented car to "lose" the private investigator following her.
Wife had several telephone conversations with Mr. Everett en
route. Wife testified she knew she was under surveillance and
purposefully ran Husband's detective around because she was
angry and wanted to cost Husband money.

Husband admitted into evidence the overnight registry
maintained by the guard gate at Harbor Island. *See* exhibit 1,

---

1. Eighty-two calls lasted more than one hour, and 17 calls lasted more
than two hours. On October 24, 1994, Wife called Mr. Everett at his
work phone at 12:26 a.m. and the call lasted until 5:07 a.m., more than
four hours. On Christmas Day, 1994, Wife and Mr. Everett spoke five
times on the phone together for a total of 127 minutes. On New Year's
Day, 1995, nine calls were made between the two for a total of 131
minutes. On January 10, 1995, twenty different phone calls were made
beginning at 12:17 a.m. until 11:20 p.m., for a total of 171 minutes.

*infra.* Husband's handwriting expert, Marvin Dawson, testified that the entry immediately following Wife's had been altered from its original state. The registry shows an entry for McElveen, arriving on February 17, 1995. The next entry shows a "LEverHart, Jake" arriving eighteen minutes after Wife and staying in an adjacent unit.

Dawson testified that the license plate, which was designated a Georgia plate on the registry, had been changed from QG26411, Everett's plate number, to QG28476. Georgia Highway Department records showed no record of a license number QG28476. Dawson further testified that the name "Everett" was originally written in the guest registry, but was changed to LEverHart by a person with different handwriting than the original author. The first name Jake was also added later, again in a different hand.

Wife was registered to unit 5B, and LEverHart was registered to unit 6B. However Dawson testified the "6" had been altered by someone writing over the original number. Finally, Dawson testified both parties were originally recorded as leaving at the exact same time: 1304 on 2/19. LEverHart's entry, however, had been altered to "1809 2/18."

Wife presented no expert testimony to refute Dawson's testimony. Moreover, our own review of the document convinces us that it was indeed altered as Dawson testified.

Dawson also testified that when he went to Harbor Island to examine the document, he was told by the guard responsible for bringing it to him that it had blown out her car window, over a bridge railing, and into the marsh. However, when Dawson accompanied the guard to the bridge, he was able to recover the document moments before the tide engulfed it. The near loss of this critical piece of evidence raises additional questions about the Harbor Island incident.

Both Wife and Mr. Everett denied having been together on any of the three weekends in question. In fact, the two asserted that they had met in person on only one occasion when Wife delivered a carrot cake to Mr. Everett's place of employment in Georgia on February 14, 1995. Wife and Mr. Everett testified she gave the cake to him in a parking lot at his office as a gesture of gratitude for his assistance in helping

her prove Husband had committed adultery. Also, Wife has given Mr. Everett's children gifts of a doll and video tapes.

We find that the Harbor Island guest registry, along with the absence of phone calls between Wife and Everett on those three weekends, and Wife's attempts to delete any record of her trips to Fripp Island, are all circumstantial evidence of opportunity. However, there is no evidence linking Wife to the alteration of the registry. As the trial court pointed out, several other individuals had access to these records, including Husband. In addition, Everett's testimony that he was not present with Wife on these three weekends was corroborated by other witnesses who the trial court specifically found to be credible and convincing.

We find the numerous phone calls, the delivery of a cake to Mr. Everett in Georgia on Valentines' Day, and Wife's efforts to evade detection and cover up her trips to Fripp Island are circumstantial evidence of inclination. However, even if this court found, taking its own view of the evidence, that Everett was present with Wife on the weekends in question, there is virtually no evidence of a romantic or sexual relationship between the two. The trial judge commented in his final order on the lack of evidence to support a showing of inclination, noting there were no love letters, romantic cards, no hand-holding, hugging, kissing, or any other romantic demonstrations or actions between the two. The trial court found this lack of evidence compelling, especially in light of the fact that Husband spent thousands of dollars on private detectives in an attempt to uncover such evidence.

Husband bore the burden at trial, as he does on appeal, of convincing the court that Wife committed adultery.[2] While adultery may be proven by circumstantial evidence, such evidence must be "so convincing as to exclude any other reasonable hypothesis but that of guilt." *Fulton v. Fulton,*

---

2. At the post-trial motion hearing, Husband introduced other evidence which tends to prove that Wife and Mr. Everett enjoy more than a platonic friendship, such as the fact that Wife has been attending Mr. Everett's church, spending weekends at his home, and is relocating to an area near there. However, all of this alleged conduct occurred post-divorce and is therefore not relevant to a determination of whether wife committed adultery during the marriage. Thus, the trial judge properly refused to consider this evidence.

293 S.C. 146, 147, 359 S.E.2d 88, 88 (Ct.App.1987). Furthermore, a divorce on the ground of adultery should be denied "if after due consideration of all the evidence proof of guilt is inconclusive." *McLaurin v. McLaurin*, 294 S.C. 132, 134, 363 S.E.2d 110, 111 (1987) (quoting *Odom v. Odom*, 248 S.C. 144, 146, 149 S.E.2d 353, 354 (1966)).

While we reiterate that this is an extremely close case, we feel the circumstantial evidence presented at trial falls short of the required "clear preponderance" of the evidence. Moreover, the able trial judge, who heard several days of testimony and observed first-hand the demeanor of the many witnesses in this case, was in a better position than this court to determine the credibility of those witnesses. *Cherry v. Thomasson*, 276 S.C. 524, 280 S.E.2d 541 (1981). We therefore defer to the trial court's decision that Husband did not present sufficient circumstantial evidence to prove Wife committed adultery.

### B. Amount

█ The trial court awarded Wife $11,000 per month, or $132,000 per year, in alimony. Husband argues this amount is excessive and would serve as a disincentive for Wife to work or to remarry. We agree.

 Alimony is a substitute for the support that is normally incident to the marital relationship. *Doe v. Doe*, 324 S.C. 492, 504, 478 S.E.2d 854, 860 (Ct.App.1996). Ordinarily, the purpose of alimony is to place the supported spouse, as nearly as is practical, in the position of support he or she enjoyed during the marriage. *Id.* Alimony should not, however, serve as a disincentive for spouses to improve their employment potential or to dissuade them from providing, to the extent possible, for their own support. *Brandi v. Brandi*, 302 S.C. 353, 358, 396 S.E.2d 124, 127 (Ct.App.1990); *Josey v. Josey*, 291 S.C. 26, 33, 351 S.E.2d 891, 896 (Ct.App.1986).

This court has previously increased an alimony award from $4,500 to $6,300. *Mallett v. Mallett*, 323 S.C. 141, 473 S.E.2d 804 (Ct.App.1996). In *Mallett* the wife had been employed only for the first four years of the parties' seventeen-year marriage, and the husband's gross income was $441,191. *Id.* at 148, 473 S.E.2d at 809. Based on the affluent lifestyle to

which the wife had become accustomed during the marriage, the husband's substantial income and the benefit to the parties' teenage son if the wife were in the home full-time, this court increased the alimony award to an amount commensurate with the figures listed as monthly expenses on the wife's financial declaration. *Id.* at 148–49, 473 S.E.2d at 809. *Mallett*'s award of $6,300 represents the highest award of periodic alimony in a reported appellate decision in South Carolina. The trial judge's award of $11,000 per month in alimony in this case eclipses the amount awarded in *Mallett* by $4,700 per month. We believe this amount is excessive.

Wife's living expenses, as stated in her financial declaration, are unnecessarily inflated.[3] Wife testified she is unsure of her ability to work full-time as a nurse due to her fybromyalgia. However, there is no medical evidence in the record which establishes that Wife's fibromyalgia precludes her from all employment. In fact, Wife testified that although Husband had been urging her for several years to return to work, she did not feel she could do so until their child was older and until the house was "renovated and organized." Thus, even Wife did not base her present inability to work solely on her medical condition. We recognize that Husband's income is substantial and that his adultery brought about the dissolution of this marriage. Nevertheless, these facts do not alter our view that $11,000 per month constitutes an excessive award. It is inconceivable to this court that such an award would not deter Wife from ever seeking to improve her financial circumstances. After careful review of Wife's financial declaration and monthly expenses, we hereby reduce Husband's monthly alimony obligation from $11,000 per month to $7,500 per month, effective immediately.

### III. Attorney Fees and Costs

Husband next argues the family court erred in awarding Wife attorney fees and costs. Specifically, Husband objects to the initial award of $85,000 ($20,000 in the *pendente lite* order and $65,000 in the final order) in fees and costs and

---

3. For example, Wife reports spending $1,105 per month for food and household supplies, $300 per month for laundry and cleaning, $900 per month for clothes, $960 per month for entertainment, $250 for child care, and $164 per month for pet expenses.

the $12,000 awarded following the post-trial proceeding. The $85,000 in fees and costs awarded to Wife included, *inter alia*, approximately $46,000 in attorney fees, approximately $11,000 in paralegal fees, $24,256.32 in CPA fees,[4] and $10,767.42 to another attorney for constitutional research. We agree that the $85,000 award should be reduced by $10,767.22, the sum due for researching the constitutionality of South Carolina's bar of alimony based on adultery, and reverse the $12,000 awarded Wife from the post-trial proceeding.

Ordinarily, the award of attorney fees lies within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Cudd v. Arline*, 277 S.C. 236, 285 S.E.2d 881 (1981). The factors to be considered in awarding reasonable attorney fees and costs include: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) the professional standing of counsel; (4) the contingency of compensation; (5) the beneficial results obtained; and (6) the customary legal fees for similar services. *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

The trial judge expressly considered each of the *Glasscock* factors in assessing fees in the final order, and we find no abuse of discretion in his award except for the fees incurred by Wife's constitutional lawyer. While we do not question the reasonableness of the fee to the constitutional lawyer, nor Wife's tactical decision to research this issue, we do not believe Husband should be required to pay for it. Wife did not raise the issue of the constitutionality of the bar to alimony at trial. Even if the trial judge had found her adultery barred her from receiving alimony, it would have been too late for Wife to raise the constitutional argument in a

---

4. Husband argues that the trial judge erred in approving fees to Raymond E. McKay, CPA, of $24,256.32 as costs included in the $85,000 award. We agree with Husband that these fees appear to be unduly high; nevertheless, the record does not include Mr. McKay's testimony during the case in chief nor does it contain an affidavit by Mr. McKay setting forth the number of hours he devoted to this case and his hourly rate. The trial judge specifically approved Mr. McKay's time and charges as "reasonable and appropriate." Since Husband is challenging the award to Mr. McKay, he bears the burden on appeal of producing a record sufficient to illustrate the alleged error. *Doe v. Greenville Hosp. Sys.*, 323 S.C. 33, 448 S.E.2d 564 (Ct.App.1994).

Rule 59(e) motion. *Patterson v. Reid,* 318 S.C. 183, 456 S.E.2d 436 (Ct.App.1995) (a party may not raise an issue for the first time in a Rule 59(e) motion which could have been raised at trial). Because this issue was never raised at trial it seems particularly inequitable to require Husband to pay the $10,767 .22 in fees. Wife was certainly free to explore any legal theory which might assist her in proving her case; nevertheless, where that theory did not provide any benefit to Wife and was not even raised at trial, Husband should not be responsible for the fees incurred thereby.

Similarly, Husband should not be required to pay the $12,000 in fees and costs which Wife incurred in the post-trial proceedings. Wife did not gain beneficial results on this issue at trial because the trial judge returned to the stipulated value of $250,000. On appeal, we have determined that once the stipulation was set aside at Wife's request, it was error for the trial judge to reinstate the stipulated amount without evidentiary support in the record. Wife's post-trial motion thus resulted in the devaluation of Husband's medical practice by $67,000 from the figure to which the parties had previously stipulated. Husband incurred his own fees and costs in the post-trial proceedings and gained beneficial results, both at trial and on appeal, on this issue. Accordingly, it was error to require Husband to pay these fees and costs incurred by Wife.

Husband shall pay Wife attorney fees and costs in the total sum of $85,000, less the $10,767.22 for Wife's constitutional lawyer. We also reverse the $12,000 award of fees and costs made in connection with Wife's post-trial motion to reconsider the assigned value of Husband's interest in his medical practice.

## IV. Child Support

Husband next contends the family court's award of $1750 per month in child support was excessive when considered independently and in conjunction with the alimony award. We disagree.

Given Husband's $500,000 per year income, the Child Support Guidelines do not cover this case. 27 S.C.Code Ann. Reg. 114–4710(A)(3) (Supp.1997) (The Child Support Guidelines provide for calculated amounts of child support for a combined parental gross income of up to $150,000 per year.)

Husband appears to suggest the family court exceeded the "maximum" amount of support that may be awarded under the guidelines. There is no such "maximum" award. Cases wherein the parents' income exceeds the highest amount contemplated by the Guidelines are to be decided on a case by case basis. *Id.* Moreover, a child is entitled to live and be supported in a lifestyle commensurate with the current income of his parents. *Miller v. Miller,* 299 S.C. 307, 384 S.E.2d 715 (1989) (child support award should be sufficient to provide for the needs of the children and to maintain the children at the standard of living they would have been provided but for the divorce); *see also Mallett v. Mallett,* 323 S.C. 141, 473 S.E.2d 804 (Ct.App.1996) (monthly child support award of $2,000 held reasonable considering the father's income and the lifestyle the child had enjoyed and was entitled to enjoy in the future). In determining Husband's child support obligation in this case, the family court considered, *inter alia,* the child's history of attending private school and Husband's testimony indicating he is willing to continue paying the child's private school tuition. The child's tuition is currently $500 per month. In our view, monthly child support of $1,750 is reasonable considering Husband's income and the lifestyle the child has enjoyed and is entitled to enjoy in the future.

## V. Security for Child Support and Alimony Obligations

Husband further argues the family court erred in requiring him to secure his alimony and child support obligations with existing life insurance policies. We agree.

Generally, the court may require a supporting spouse to secure his support obligation. S.C.Code Ann. § 20-3-160 (1985). However, there must be a compelling reason to do so. *Mallett v. Mallett,* 323 S.C. 141, 473 S.E.2d 804 (Ct.App.1996); *Harlan v. Harlan,* 300 S.C. 537, 389 S.E.2d 165 (Ct.App.1990); *Ivey v. Ivey,* 286 S.C. 315, 334 S.E.2d 123 (Ct.App.1985). The ability of the supporting spouse to pay (whether he or she earns adequate income to meet the obligation) and the spouse's willingness to pay are relevant factors. *See Mallett,* 323 S.C. at 150, 473 S.E.2d at 810; *Harlan,* 300 S.C. at 540, 389 S.E.2d at 167–68, *Ivey,* 286 S.C. at 318, 334 S.E.2d at 125.

Wife does not argue the family court had a compelling reason to order Husband to secure his support obligations.

Rather, she argues the issue is not preserved for appeal because it was neither presented to nor ruled upon by the trial judge. However, Wife's own Complaint requested that Husband be required to provide security for support. The trial judge clearly ruled on that issue in his order, finding that security for Husband's support obligations was "necessary". Husband argued the issue of the security requirement in his post-trial motion. Thus, we find this issue is preserved for appellate review.

We find no "compelling reason" to justify requiring Husband to secure his alimony and child support payments. There is no indication Husband suffers from any major health problems, he has not shunned his support obligations, and he has adequate income to meet those obligations. Accordingly, we reverse that portion of the trial judge's order.

## VI. $50,000 Cash Award

■■■ Husband argues the family court erred in awarding Wife $50,000 in cash to complete renovations on the parties' home. Specifically, Husband asserts the court should have valued and divided the home on an "as-is" basis instead of ordering Husband to pay prospective costs of completion. Husband further contends the finding was error because Wife had immediate plans to vacate the home. Husband also complains the $50,000 cash award amounts to a cash payment from his personal income because the court was unable to make an in-kind division. We find no error.

The court determined the marital property should be divided "approximately equally." The court valued the parties' marital home at $247,000, found the parties had $86,657 in equity therein, and awarded the home to Wife. The court went on to allocate specific properties, including assets and liabilities, to each party. Husband was awarded, among other things, his interest in his medical practice. The court's award of $50,000 to Wife, although designated as "cost to complete" in the divorce decree, was expressly made to equalize the equitable distribution award. The court noted, "the Court accepts Defendant–Father's appraisal [of the marital residence] at $247,000.00 and rejects the contention that [the] $50,000.00 cost to complete should be considered as a valuation matter. Rather, the Court finds that the $50,000 cost to

complete should be allocated and considered in the overall division as a cash payment to bring the division into balance, as discussed below."

As to the court's failure to divide a tangible asset in order to equalize the award, we note the parties had very few "tangible" assets to divide. Those that could be divided on an in-kind basis were so divided. Husband does not suggest what asset the family court could have divided in order to equalize the award without requiring a cash payment. Thus, Husband has failed to meet his burden of showing error in this regard. *Skinner v. King*, 272 S.C. 520, 252 S.E.2d 891 (1979) (appellant bears burden of convincing the appellate court that the family court erred.)

Although we affirm the trial judge's decision to equalize the equitable distribution award to Wife, we hereby reduce the award to $16,500 to reflect our previous holding on the valuation of Husband's medical practice. Because we hold Husband's medical practice should be valued at $183,000 rather than the family court judge's value of $250,000, the difference of $67,000 should be allocated between the two parties. Thus, Husband's obligation to Wife is reduced by $33,500.

For the foregoing reasons, the decision of the family court is **AFFIRMED IN PART AND REVERSED IN PART.**

ANDERSON and HOWARD, JJ., concur.